## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OKKO Business PE,

        Plaintiff,

   v.

       Civil Action No. 1:14-cv-925 (CKK)

JACOB J. LEW et al.,

        Defendants.

## MEMORANDUM OPINION
(September 28, 2015)

Plaintiff OKKO Business PE ("Plaintiff") brings this action challenging the Office of Foreign Assets Control ("OFAC")'s denial of Plaintiff's application for a license to unblock a wire transfer of 200,000 Euros originating from Plaintiff. The intended beneficiary of the wire transfer was UE Belarusian Oil Trading House ("UEB"), a Belarusian entity designated by the President as a target of U.S. sanctions. Presently before the Court is Defendants' [11] Motion for Summary Judgment. Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court GRANTS Defendants' Motion for Summary Judgment. The Court

---

[1] While the Court renders its decision on the record as a whole, its consideration has focused on the following documents: Plaintiff's Complaint ("Compl."), ECF No. 1; Defendants' Motion for Summary Judgment ("Defs.' Mot."), ECF No. 11; Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp'n"), ECF No. 13; Defendants' Reply in Support of Defendants' Motion for Summary Judgment ("Defs.' Reply), ECF No. 15. The Court considers the Revised Kuchabskyy Declaration, Exhibit 1 to Plaintiff's Opposition, ("Rev. Decl.") as well as the Declaration of John E. Smith, attached to Defendant's Motion for Summary Judgment ("Smith Decl.") to the extent that they provide background regarding the particular decisions at issue here. *See Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996); *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 152-53 (D.D.C. 2010). In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

enters judgment for Defendant. Accordingly, this action is DISMISSED in its entirety.

# I. BACKGROUND

The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706 authorizes the President to declare a national emergency when any "extraordinary threat" to the United States arises that originates in substantial part in a foreign state. "Such a declaration clothes the President with extensive authority set out in 50 U.S.C. § 1702." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 159 (D.C. Cir. 2003). Under Section 1702, the President may "investigate, regulate, or prohibit" transactions in foreign exchange, banking transfers, and importation or exportation of currency or securities by persons or with respect to property, subject to the jurisdiction of the United States. 50 U.S.C. § 1702(a)(1)(A). Furthermore, the President may,

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States. . . .

50 U.S.C. § 1702(a)(1)(B).

In June 2006, the President, pursuant to his authority under the IEEPA, declared a national emergency as to Belarus. The President found that the actions and policies of certain members of the Government of Belarus and other persons to undermine Belarus' democratic processes, to commit human rights abuses, and to engage in public corruption, constituted an extraordinary threat to the national security and foreign policy of the United States. *See* Exec. Order No. 13405, 71 Fed. Reg. 35485 (June 16, 2006) ("E.O. 13405"). In response to this threat, the President blocked "all property and interests in property" of persons listed on the Annex to E.O. 13405 as well as any persons subsequently determined by the Secretary of Treasury to meet

one or more of the criteria in E.O. 13405. *Id.* On May 15, 2008, OFAC added UEB to the list of entities that met one or more of the criteria in E.O. 13405. Administrative Record ("A.R.") 000019. OFAC's decision was based on information providing reasons to believe that UEB acts as a clearinghouse for financial, contractual, and web-based transactions on behalf of Belarus' largest petrochemical conglomerate, which in turn is controlled by Belarusian President Alexander Lukashenko—an individual listed by the President on the Annex to E.O. 13405.[2]

In 2010, OFAC, acting pursuant to authority delegated by the President, *see* E.O. 13405 § 5, and the Secretary of the Treasury, *see* 31 C.F.R. § 548.802, promulgated regulations ("Belarus regulations)" to implement E.O. 13405. *See generally* 31 C.F.R. Pt. 548. The Belarus regulations provide that unless otherwise authorized, "all property and interests in property [of a person designated under E.O. 13405] that hereafter come within . . . the possession or control of U.S. persons, including their overseas branches . . . may not be transferred, paid, exported, withdrawn or otherwise dealt in." 31 C.F.R. § 548.201(a). The same or similar blocking language is used in most OFAC sanctions regulations.[3]

---

[2] According to the OFAC press release announcing the decision, UEB operates an online auction trading system and is a clearinghouse for financial, contractual, and web-based transactions on behalf of the petrochemical conglomerate, Belneftekhim Concern, and its subsidiaries. *See* Treasury Designates Three Entities of Major Petrochemicals Conglomerate in Belarus, May 15, 2008, *available at* http://www.treasury.gov/press-center/press-releases/Pages/hp978.aspx. Belneftekhim Concern was previously added to the List of Specially Designated Nationals and Blocked Persons on November 13, 2007, based upon OFAC's determination that it is controlled by Belarusian President Alexander Lukashenko. *See* Treasury Targets Lukashenko-controlled Petrochemical Conglomerate, November 13, 2007, *available at* http://www.treasury.gov/press-center/press-releases/Pages/hp676.aspx.

[3] *See, e.g.,* 31 C.F.R. § 537.201(a) (Burmese Sanctions Regulations); 31 C.F.R. § 538.201(a) (Sudanese Sanctions Regulations); 31 C.F.R. § 542.201(a) (Syrian Sanctions Regulations); 31 C.F.R § 544.201(a) (Weapons of Mass Destruction Proliferators Sanctions Regulations); 31 C.F.R. § 560.211(a) (Iranian Transactions and Sanctions Regulations); 31 C.F.R. § 594.201(a) (Global Terrorism Sanctions Regulations).

On April 3, 2012, Plaintiff, a privately-owned corporation located in Ukraine, entered into a deposit agreement with UEB. AR 000001. The purpose of the agreement was to participate in an auction organized by UEB to purchase certain oil products. AR 000002. Under the agreement, UEB would serve as the "Auction Organizer" and Plaintiff would be a "Bidder." AR 000005. In order to participate in the auction, each bidder was required to deposit 200,000 Euros into UEB's bank account. AR 000008. This deposit served as a "guarantee that the Bidder [would] carry out the actions stipulated" in the agreement. AR 000008. Bidders were not entitled to dispose of their deposits after entry into UEB's bank account, and UEB retained each deposit over the course of the auction. AR 000010. In the event that the bidder lost or did not take part in the auction, UEB would return the deposit to the bidder within five banking days upon receiving a written demand from the bidder. AR 000010-11. Alternatively, if the bidder won, UEB would return the deposit to the bidder after the execution of a separate supply agreement between the seller and bidder. AR 000010. If the bidder won, but refused to carry out its obligations, UEB would transfer the bidder's deposit to the seller. AR 000011.

On May 4, 2012, Plaintiff, as a potential bidder, initiated a transfer of 200,000 Euros from its account with CITI Bank Ukraine to UEB's bank account in Belarus. AR 000001. The funds were routed through Citibank, N.A., in the United Kingdom, which blocked the transfer in accordance with E.O. 13405. AR 000001-2. On May 30, 2012, Plaintiff submitted a three-page online application seeking a license from OFAC to unblock the funds. AR 000001-4. The application included additional space at the end, where applicants could provide a "detailed explanation of the transaction, including the purpose of the payment." AR 000001-4. In that space, Plaintiff stated that the purpose of the wire transfer was to pay the deposit for "participation in auctions to purchase petroleum products from Belarusian oil refiners" in

accordance with their deposit agreement with UEB. AR 000002. Plaintiff attached a copy of the deposit agreement to its application. AR 000002, 000005-15.

OFAC denied Plaintiff's application by letter dated October 12, 2012. AR 000017-18. The denial stated that U.S. financial institutions were required to block "all wire transfers in which a sanctions target has an interest," and an "interest in property sufficient to require blocking may be an interest of any nature whatsoever, direct or indirect." AR 000017. The denial explained that the blocked funds transfer in question involved an "interest of a sanctions target described in the Executive Order 13405," specifically UEB, and that it was "OFAC's policy to license the release of blocked property only in limited circumstances, most of which do not involve commercial activity." AR 000017-18. OFAC determined "upon review" that "the blocked funds transfer did not fall within those limited circumstances." AR 000017-18. OFAC's letter also noted that OFAC does not recognize attempts to extinguish an interest of a sanctions target in a transfer once that transfer has been blocked. AR 000017-18.

On March 1, 2013, Plaintiff, through counsel, requested reconsideration of OFAC's denial of its May 30, 2012 unblocking request. AR 000019-23. Plaintiff's request for reconsideration stated that at the time it initiated the funds transfer, Plaintiff did not know that UEB was a U.S. sanctions target, and that since the denial of Plaintiff's original request, Plaintiff had cancelled its contract with UEB and that UEB's interest in the funds had "been extinguished." AR 000019-23. Plaintiff indicated that it would never again transact with UEB, and that continued blocking of the funds would not further U.S. foreign policy goals. AR 000019-23. Plaintiff included supporting documentation that included a notice of unilateral termination issued by UEB and a declaration signed by Plaintiff's managing officer. AR 000019-21, AR 000039-41.

OFAC denied Plaintiff's request for reconsideration by letter dated September 6, 2013. AR 000084. OFAC's denial of Plaintiff's reconsideration request stated that OFAC licensed the release of blocked funds "only under limited and compelling circumstances consistent with the national security and foreign policy interests of the United States." AR 000084. In its letter, OFAC stated that it had reviewed the information submitted by Plaintiff, and that OFAC had again determined that licensing the release of the blocked funds would be inconsistent with OFAC policy. AR 000084.

Plaintiff filed the instant action on May 30, 2014, alleging that OFAC's decisions violated Section 706(2) of the Administrative Procedure Act ("APA"). On September 24, 2014, Defendants filed their motion for summary judgment.

## II. LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." However, "when a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083 (D.C. Cir. 2001). Accordingly, "the standard set forth in Rule 56[ ] does not apply because of the limited role of a court in reviewing the administrative record. . . . Summary judgment is [ ] the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Southeast Conference v. Vilsack,* 684 F.Supp.2d 135, 142 (D.D.C.2010).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 513

(2009).  It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."  5 U.S.C. § 706(2).  The arbitrary and capricious standard "is a 'narrow' standard of review as courts defer to the agency's expertise." *Ctr. for Food Safety v. Salazar,* 898 F.Supp.2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)).  An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43 (internal quotation omitted).  The reviewing court "is not to substitute its judgment for that of the agency." *Id.*  Nevertheless, a decision that is not fully explained may be upheld "if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 286 (1974).

A review of a decision made by OFAC is "extremely deferential" because OFAC operates "in an area at the intersection of national security, foreign policy, and administrative law." *Islamic Am. Relief Agency v. Gonzales,* 477 F.3d 728, 734 (D.C. Cir. 2007).  *See also Em. Coalition to Defend Educ. Travel v. United States Dep't of Treasury,* 498 F.Supp.2d 150, 166 n.10 (D.D.C.2007) ("[T]he regulations at issue here are entitled to an even greater measure of deference [than *Chevron* deference] because they relate to the exercise of the Executive's authority in the realm of foreign affairs.").

### III. DISCUSSION

Defendants move for summary judgment pursuant to Rule 56, arguing that OFAC's decisions were in accordance with all applicable provisions of the APA. Plaintiff opposes Defendant's Motion, arguing that OFAC's denial of Plaintiff's application was (1) "arbitrary and capricious" under Section 706(2)(A); (2) made in "excess of statutory authority" under Section 706(2)(C); and (3) "unwarranted by the facts to the extent they are subject to trial de novo" under Section 706(2)(F).

### A. Statutory Framework

Under the IEEPA, the President may "block . . . transactions involving, *any* property in which any foreign country or a national thereof has *any interest* by any person, or with respect to *any* property, subject to the jurisdiction of the United States." 50 U.S.C. 1702(a)(1)(B) (emphasis added). The sweeping language of Section 1702 "imposes no limit on the scope of interest" blockable under the IEEPA. *Holy Land*, 333 F.3d at 162. Pursuant to explicit authorization from Congress, 50 U.S.C. § 1704, OFAC has promulgated regulations, including the Belarus regulations, which consistently cast an equally broad net as to the types of interests blockable under the IEEPA. The Belarus regulations define "property" and "property interest" to include, *inter alia*, "any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 548.308. OFAC has further defined "interest" when used with respect to property to mean "an interest of *any nature whatsoever*, direct or indirect." 31 C.F.R. § 548.305 (emphasis added). Likewise, the Belarus regulations define "transfer" broadly:

> The term transfer means any actual or purported act or transaction, . . . whether or not done or performed within the United States, the purpose, intent, or effect of which is to . . . release, convey, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property. Without

> limitation on the foregoing, it shall include the making, execution, or delivery of any assignment, power, conveyance, . . . agreement, contract, or [or] sale . . . .

31 C.F.R. § 548.309. These same or similar definitions are used throughout OFAC's regulations,[4] and have been repeatedly upheld by reviewing courts. *See, e.g.*, *Holy Land*, 333 F.3d at 162. OFAC, according to the D.C. Circuit, may "choose and apply its own definition of property interests, subject to deferential judicial review." *Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 701 (D.C. Cir. 1994) ("*Consarc I*"). Therefore, Courts must give effect to OFAC's definition of property interest unless that definition "contradict(s) express statutory language or prove(s) unreasonable." *Id.*

Under its sanctions programs, OFAC may, by request, issue a "specific license" to authorize an otherwise prohibited transaction or service. *See* 31 C.F.R. § 501.801. OFAC has interpreted its blocking authority under the IEEPA and implementing executive orders as granting it discretionary authority to issue or withhold such licenses based on national security and foreign policy considerations, and OFAC regulations generally do not compel the issuance of a specific license once certain criteria are met. *See Zarmach*, 750 F. Supp. 2d at 153; *see also* Smith Decl. ¶ 14. A beneficiary's interest in blocked property is extinguished once the property has been transferred pursuant to an OFAC-licensed transfer, or the national emergency underpinning the blocking is terminated. *See* 31 C.F.R. § 548.403; Smith Decl. ¶ 16.

---

[4] *See, e.g.*, 31 C.F.R. §§ 537.315, 537.309, 537.317 (Burmese Sanctions Regulations); 31 C.F.R. §§ 538.310, 538.307, 538.313 (Sudanese Sanctions Regulations); 31 C.F.R. §§ 542.315, 542.308, 542.317 (Syrian Sanctions Regulations); 31 C.F.R §§ 544.308, 544.305, 544.309 (Weapons of Mass Destruction Proliferators Sanctions Regulations); 31 C.F.R. §§ 560.325, 560.323, 560.326 (Iranian Transactions and Sanctions Regulations); 31 C.F.R. §§ 594.309, 594.306, 594.312 (Global Terrorism Sanctions Regulations).

**B. OFAC's Denial of Plaintiff's Application Was Not Arbitrary and Capricious**

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, a court must uphold an agency decision that is supported by a rational basis. *See Holy Land*, 333 F.3d at 162.

**a. OFAC's Conclusion that UEB had an "Interest" in the Blocked Property Is Supported by a Rational Basis**

Plaintiff argues that OFAC's denial of Plaintiff's license application was arbitrary and capricious because UEB never acquired an interest in the deposit because under the deposit agreement, the funds would revert back to the Plaintiff after the conclusion of the auction. Pl.'s Opp'n at 10, 14. Plaintiff's argument, however, is in opposition to the plain language of the IEEPA and the case law that have addressed the interpretation of the term, "interest," within the context of sanctions regulations administered by OFAC under the IEEPA.

The D.C. Circuit has repeatedly held that the sweeping language of the IEEPA "imposes no limit on the scope of interest" blockable under the IEEPA, and that an "interest when used with respect to property means "an interest of any nature whatsoever, direct or indirect." *Holy Land*, 333 F.3d at 162; *see also* 50 U.S.C. § 1702(a), 31 C.F.R. § 548.30. A sanctions target need not have a "legally enforceable ownership interest" to justify a blocking under U.S. regulations. *Holy Land*, 333 F.3d at 162-63. In *Holy Land*, the D.C. Circuit affirmed the lower court's decision upholding an agency action taken by OFAC to block the assets of a domestic charity organization that OFAC determined to be controlled by Hamas. *See Holy Land*, 219 F. Supp. 2d 57, 68 (D.D.C. 2002) *aff'd*, 333 F.3d 156 (D.C. Cir. 2003). The lower court, citing the plain text of the IEEPA and affording deference to OFAC's interpretation of its own regulations, upheld the blocking of the charity's funds, even though Hamas had no "legally enforceable ownership

interest" in the funds.  *Id*.  In its affirmance, the D.C. Circuit reasoned that the IEEPA "is designed to give the President means to control assets that could be used by enemy aliens," and therefore the IEEPA covers interests "not defined in traditional common law terms."  *Holy Land*, 333 F.3d at 163 (*citing Global Relief Foundation, Inc. v. O'Neill*, 315 F.3d 748 (7th Cir. 2002)).[5] Moreover, because OFAC is interpreting the term, "interest," as defined in its own regulations, OFAC's construction merits "an even greater degree of deference than the *Chevron* standard, and must prevail unless plainly inconsistent with the regulation."  *Consarc Corp. v. U.S. Treasury Dep't, Office of Foreign Assets Control*, 71 F.3d 909, 915 (D.C. Cir. 1995) (citation and internal punctuation omitted) ("*Consarc II*").  Therefore, the appropriate inquiry is whether OFAC's construction has departed so far from common usage as to be "plainly wrong."  *Consarc I*, 27 F.3d at 702.

Here, the basis in the administrative record for OFAC's conclusion that UEB had an "interest" in the blocked property is clear.  Both Plaintiff's original application and Plaintiff's request for reconsideration of OFAC's initial denial stated that the blocked funds were to be deposited directly into a bank account owned and operated by UEB, as part of a commercial transaction to which UEB was a party.  AR 000002, AR 000021.  Plaintiff argues that UEB had no "interest" in the funds because under the deposit agreement, the funds would revert back to the Plaintiff after the conclusion of the auction.  Pl.'s Opp'n at 14.  The administrative record, however, makes clear that bidders were not entitled to dispose of the funds while the funds were in UEB's account, and there is nothing in the record to suggest that UEB would have lacked

---

[5] Plaintiff misconstrues the holding in *Holy Land* and argues that "interest" under the IEEPA means at least a "beneficial interest," *see* Pl.'s Opp'n at 13.  The D.C. Circuit's opinion, however, clearly states that "interest" under the IEEPA "need not be a legally protected one," and encompasses "any interest," *including* a "beneficial interest" or "an interest not defined in traditional common law terms."  333 F.3d at 163.

access to this account or control over the money in it.  AR 000010.  Moreover, the deposit agreement required UEB to return the funds five days after a "written demand" from the bidder. AR 000010-11.  Until the bidder issued such a demand—an event that appeared likely, but not certain, under the administrative record—the funds would have remained in UEB's bank account under UEB's control.  *Id.*  Under these facts, OFAC concluded that UEB's "interest" in the blocked funds constituted "an interest of any nature whatsoever, direct or indirect."  AR 000017.

In light of the plain text of the IEEPA and OFAC's regulations broadly defining the term "interest," the deference that must be afforded to OFAC's interpretation of its own regulations, and the controlling case law, the Court cannot conclude that OFAC's decision lacked a rational basis.  *See Holy Land*, 333 F.3d at 163; *see also* 50 U.S.C. § 1702(a), 31 C.F.R. § 548.30.

### b.  The Facts Relied Upon by OFAC Are Rationally Connected to the Continued Blocking of the Funds in Question

Plaintiff argues that OFAC failed to provide a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made."  Pl.'s Opp'n at 15.  Plaintiff argues that OFAC "failed to review the deposit agreement" and "automatically affirmed the block based upon the fact that UEB is a designated party."  *Id.* at 15-16.  Plaintiff contends that the record is "devoid of any deliberative agency process regarding Plaintiff's requests for unblocking."  *Id.* at 17.  Plaintiff's arguments are without merit.

OFAC's decision letters attest, and the administrative record confirms, that OFAC reviewed both Plaintiff's initial application and its request for reconsideration, but ultimately decided that unblocking the funds would be contrary to the policy objectives of the Belarus sanctions program.  In its letter denying Plaintiff's initial application, OFAC stated that based on information "reflected by [Plaintiff's] application," the blocked funds in question involved a UEB property interest.  AR 000017.  OFAC's letter also explained that after reviewing the

application, OFAC determined that granting a license would be inconsistent with OFAC policy because the interest involved commercial activity. AR 000017-18. OFAC's denial of Plaintiff's request for reconsideration contained similar language. AR 000084. Moreover, the administrative record contains internal emails clearly indicating that OFAC considered the fact that under the deposit agreement, Plaintiff was "making a deposit to participate in an auction organization by UEB, the terms of which required the applicant to send the money to UEB's account." AR 000048. The record further indicates that OFAC considered all of Plaintiff's key arguments made in its reconsideration request. *See* AR 000048. Specifically, OFAC considered Plaintiff's arguments that (1) "the US government's foreign policy interest isn't being helped by the continued blocking of these funds; (2) Plaintiff didn't know that UEB was a sanctions target; and (3) Plaintiff had "cancelled their agreement with [UEB] based on this block." *See* AR 000048. OFAC's decision to continue blocking the funds at issue, despite Plaintiff's arguments, is rationally connected to OFAC's stated policy objectives related to blocking.[6]

It is not the Court's role to undertake its own fact-finding or substitute its own judgment for that of OFAC. *See Holy Land*, 333 F.3d at 162. The administrative record demonstrates that there was a rational connection between the facts found and the choice made by OFAC. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also Zarmach*, 750 F. Supp. 2d at 158 (upholding OFAC denials of unblocking application and reconsideration request under similar administrative record).

---

[6] OFAC's stated policies include, *inter alia*, (1) limiting the flow of currency and other property to or for the benefit of a sanctions target, thereby preventing use that conflicts with U.S. interests; (2) disrupting commercial transactions with a sanctions target, thus isolating the target, raising the costs of engaging in such transactions, and discouraging third country business with a sanctions target; and (3) disrupting national security threats, minimizing sanctions evasions, and increasing the Executive's leverage when dealing with such threats. Smith Decl. ¶ 11-12.

**C.  OFAC Did Not Exceed Its Statutory Authority by Continuing to Block the Funds in Question**

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

Plaintiff argues that OFAC exceeded its authority by continuing to block the funds in question because UEB's interest in the blocked property was extinguished under principles of contract law, or in the alternative, unilateral action taken by Plaintiff.  *See* Pl.'s Opp'n at 20-22.[7] Plaintiff argues that the contract was terminated due to the failure of Plaintiff to comply with the specific terms of the agreement, namely Plaintiff's failure to provide the deposit.  *See id.* at 22. Alternatively, Plaintiff argues that UEB's interest was terminated when Plaintiff cancelled its agreement with UEB.  *See id.*  Plaintiff's arguments are tenuous and inconsistent with established sanctions law.  The IEEPA and related regulations provide only one method by which the UEB's interest in the funds may be extinguished:  a valid license from OFAC.  *See* 31 C.F.R. § 548.403(a).  The regulations contain "no provision by which the efforts of a sanctions target and a company it wishes to do business with can, on their own, 'un-block' assets frozen by OFAC." *Zarmach*, 750 F. Supp. 2d at 157.  By contrast, the regulations explicitly state that a blocked interest may not be "transferred, paid, exported, withdrawn, or otherwise dealt in."  31 C.F.R. § 548.201(a).  Accordingly, UEB's interest may not be extinguished by operation of the

---

[7] Plaintiff also argues that OFAC exceeded its authority by continuing the block of funds because UEB never held an interest in the blocked funds.  *See* Pl.'s Opp'n at 20.  As discussed earlier in the Court's opinion, the administrative record demonstrates that OFAC had a rational basis for concluding that UEB held an interest in the blocked funds.  *See* Section B, *supra*.

parties' contract. *See id.*[8] Similarly, Plaintiff cannot, through unilateral actions, extinguish UEB's interest in the blocked funds. *See Zarmach*, 750 F. Supp. 2d at 157. As OFAC has observed, allowing third parties to extinguish property interests in such ways could undermine OFAC's policy of discouraging "companies worldwide from doing business with the sanctions target and places companies at risk for having their assets frozen should they inadvertently be routed through the United States . . . ." *Zarmach*, 750 F. Supp. 2d at 157. Making exceptions for third parties, such as Plaintiff, who attempt to cancel their transaction with a sanction entity would dilute the effectiveness of the sanctions program by lowering the risks and costs of doing business with sanctions targets. *See* Smith Decl. ¶ 13. Plaintiff disagrees, arguing that continued blocking in this case not only fails to achieve OFAC's stated policy objectives, it "actually harms U.S. foreign policy and national security objectives by unnecessarily harming America's reputation overseas." *See* Pl's Opp'n at 23-25, AR 000022.

Whether continued blocking is an effective strategy at fulfilling OFAC's foreign policy objectives, however, is not a question for this court. *See Zarmach*, 750 F. Supp. 2d at 157-58. Matters of strategy and tactics relating to the conduct of foreign policy "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Regan v. Wild*, 468 U.S. 222, 242 (1984). Accordingly, the Court cannot conclude that OFAC exceeded its statutory authority by continuing to block the funds in question. *See Zarmach*, 750 F. Supp. 2d at 155-57.

---

[8]Plaintiff cites no authority to support its argument that an interest under the IEEPA may be extinguished by operation of contract law, in violation of OFAC regulations. *See* Pl.'s Opp'n at 22-23.

**D.  OFAC's Decisions Were Not Unwarranted by the Facts to the Extent that the Facts are Subject to Trial *De Novo***

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." 5 U.S.C. § 706(2)(F).  *De novo* review is appropriate under Section 706(2)(F) of the APA "when the action is adjudicatory in nature and the agency factfinding procedures are inadequate." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971); *see also Camp v. Pitts*, 411 U.S. 138, 141-42 (1973) (same, citing *Overton Park*). *De novo* review is appropriate only where the underlying procedures are inadequate to the extent that they are deemed "severely defective." *Nat'l Org. for Women v. Soc. Sec. Admin.*, 736 F.2d 727, 745 (D.C. Cir. 1984).

Plaintiff argues that "OFAC failed to fully evaluate the underlying factual circumstances giving rise to the blocking of funds." Pl.'s Opp'n at 26. Plaintiff alleges that OFAC "did not review the terms of the deposit agreement, did not acknowledge Plaintiff's lack of intent to transact with a blocked party, nor fully addressed the policy arguments proffered by Plaintiff." *Id*. The Court finds Plaintiff's arguments lacking in merit.  OFAC's decision letters attest that OFAC reviewed both Plaintiff's initial application and its request for reconsideration, but ultimately decided that unblocking the funds would be contrary to the policy objectives of the Belarus sanctions program.  In its letter denying Plaintiff's initial application, OFAC stated that based on information "reflected by [Plaintiff's] application," the blocked funds in question involved a UEB property interest.  AR 000017.  OFAC's letter also explained that after reviewing the application, OFAC determined that granting a license would be inconsistent with OFAC policy because the interest involved commercial activity.  AR 000017-18.  OFAC's denial of Plaintiff's request for reconsideration contained similar language.  AR 000084.  At most,

16

Plaintiff raises a question as to whether OFAC adequately explained its decision, but such an inadequacy would not constitute "a deficiency in fact-finding procedures such as to warrant the *de novo* [review of OFAC's fact finding procedures]." *See Pitts*, 411 U.S. at 142.

Accordingly, the Court concludes that OFAC's decisions to continue blocking the funds in question were permissible under the APA. *See* 5 U.S.C. § 706(2).

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' [11] Motion for Summary Judgment. The Court enters judgment for Defendant. Accordingly, this action is DISMISSED in its entirety.

An appropriate Order accompanies this Memorandum Opinion.

Dated: September 28, 2015

                                                                          /s/
                                                          COLLEEN KOLLAR-KOTELLY
                                                          United States District Judge